# United States Court of Appeals for the Federal Circuit

—————————

**KLAMATH IRRIGATION DISTRICT, TULELAKE IRRIGATION DISTRICT, KLAMATH DRAINAGE DISTRICT, POE VALLEY IMPROVEMENT DISTRICT, SUNNYSIDE IRRIGATION DISTRICT, KLAMATH BASIN IMPROVEMENT DISTRICT, KLAMATH HILLS DISTRICT IMPROVEMENT CO., MIDLAND DISTRICT IMPROVEMENT CO., MALIN IRRIGATION DISTRICT, ENTERPRISE IRRIGATION DISTRICT, PINE GROVE IRRIGATION DISTRICT, WESTSIDE IMPROVEMENT DISTRICT NO. 4, SHASTA VIEW IRRIGATION DISTRICT, VAN BRIMMER DITCH CO., FRED A. ROBISON, ALBERT J. ROBISON, LONNY E. BALEY, MARK R. TROTMAN, BALEY TROTMAN FARMS, JAMES L. MOORE, CHERYL L. MOORE, DANIEL G. CHIN, DELORIS D. CHIN, WONG POTATOES, INC., MICHAEL J. BYRNE, DANIEL W. BYRNE, AND BYRNE BROTHERS,**
*Plaintiffs-Appellants,*

v.

**UNITED STATES,**
*Defendant-Appellee,*

**and**

**PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,**
*Defendant-Appellee.*

—————————

2007-5115

————————————

Appeal from the United States Court of Federal Claims in 01-CV-591, 01-CV-5910 through 01-CV-59125, Judge Francis M. Allegra.

————————————

Decided: February 17, 2011

————————————

ROGER J. MARZULLA, Marzulla Law, of Washington, DC, argued for plaintiffs-appellants. With him on the brief was NANCIE G. MARZULLA. Of counsel was GREGORY T. JAEGER.

KATHERINE J. BARTON, Attorney, Appellate Section, Environment and Natural Resources Division, United States Department of Justice, of Washington, DC, argued for all defendants-appellees. With her on the brief for defendant-appellee United States were RONALD J. TENPAS, Acting Assistant Attorney General, and KATHRYN E. KOVACS, Attorney, of Washington, DC, KRISTINE S. TARDIFF, Attorney, of Concord, New Hampshire, and STEPHEN M. MACFARLANE, Attorney, of Sacramento, California.

TODD D. TRUE, Earthjustice, of Seattle, Washington, for defendant-appellee Pacific Coast Federation of Fishermen's Associations. Of counsel was SHAUN A. GOHO.

WALTER R. ECHO-HAWK, Native American Rights Fund, of Boulder, Colorado, for amicus curiae Klamath Tribes. With him on the brief was THOMAS P. SCHLOSSER, Morisset, Schlosser, Jozwiak & McGaw, of Seattle, Washington, for amicus curiae Hoopa Valley Indian Tribe.

JOHN ECHEVERRIA, Georgetown Environmental Law & Policy Institute, of Washington, DC, for amicus curiae Natural Resources Defense Council. With him on the brief were HAMILTON CANDEE and KATHERINE S. POOLE, Natural Resources Defense Council, of San Francisco, California.

---

Before BRYSON, SCHALL, and GAJARSA, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* SCHALL. Opinion concurring-in-part and concurring in the judgment filed by *Circuit Judge* GAJARSA.

SCHALL, *Circuit Judge*.

Plaintiffs-Appellants ("plaintiffs") are fourteen water, drainage, and irrigation districts and thirteen agricultural landowners in Oregon and California.[1] Plaintiffs appeal the final judgment of the United States Court of Federal Claims that, based on two separate summary judgment decisions, dismissed their Fifth Amendment takings claims, their claims under the Klamath River Basin Compact, Pub. L. No. 85-222, 71 Stat. 497 (1957) (the "Klamath Basin Compact" or the "Compact"), and their breach of contract claims. *See Klamath Irrigation Dist. v. United States*, 67 Fed. Cl. 504 (2005) ("*Takings Decision*"); *Klamath Irrigation Dist. v. United States*, 75 Fed. Cl. 677 (2007) ("*Contract Decision*").

On July 16, 2008, we certified three questions relating to the takings and Compact claims to the Oregon Supreme Court. *See Klamath Irrigation Dist. v. United*

---

[1] We sometimes refer to the plaintiff water, drainage, and irrigation districts as the "districts."

*States*, 532 F.3d 1376 (Fed. Cir. 2008) ("*Certification Order*"). The certification was pursuant to a procedure whereby unsettled questions of state law may be certified to the Oregon Supreme Court. *See* Or. Rev. Stat. §§ 28.200-28.255 (2010). Pending action by the Oregon court, we withheld decision on all of plaintiffs' claims. The Oregon Supreme Court accepted the case for certification, *Klamath Irrigation Dist. v. United States*, 202 P.3d 159 (Or. 2009), and on March 11, 2010, the court rendered its decision, answering our certified questions. *See Klamath Irrigation Dist. v. United States*, 348 Or. 15, 227 P.3d 1145 (Or. 2010) (en banc) ("*Certification Decision*").

We now vacate the judgment of the Court of Federal Claims and remand the case to the court for further proceedings. On remand, the court is to (1) consider the takings and Compact claims in light of the *Certification Decision*; (2) determine whether, as far as the breach of contract claims are concerned, the government can establish that, for purposes of its defense based on the sovereign acts doctrine, contract performance was impossible; and (3) decide the breach of contract claims as appropriate.

BACKGROUND

I.

Plaintiffs are users of water in the Klamath River Basin. Located in southern Oregon and northern California, the Klamath River Basin is the drainage basin of the Klamath River, the Lost River, and the Link River, as well as various other rivers. Water flow from Upper Klamath Lake in Oregon into the lower Klamath River is controlled by the Link River Dam. Upper Klamath Lake has a shallow depth and limited water capacity that fluctuates with wet and dry periods; thus, downstream flow to lower portions of the Klamath River and ulti-

mately the Klamath River Basin is affected by droughts. *See Takings Decision*, 67 Fed. Cl. at 509-10.

The Klamath Irrigation Project (the "Klamath Project" or the "Project") is an irrigation project that benefits primarily southern Oregon and portions of northern California, including the Klamath River Basin. The Project has its origins in the Reclamation Act of 1902, ch. 1093, 32 Stat. 388 (codified, as amended, at 43 U.S.C. § 371 *et seq.*) (the "Reclamation Act"). The Reclamation Act directed the Secretary of the Interior to reclaim arid lands in certain western states through irrigation projects. In 1905, Congress authorized the development of the Klamath Project. *See* Act of February 9, 1905, ch. 567, 33 Stat. 714. Shortly thereafter, the Oregon legislature passed its own reclamation legislation. Among other things, that legislation created a procedure to assist the United States in appropriating water for the irrigation works contemplated by the Reclamation Act. *See* Or. Gen. Laws, 1905, ch. 228, § 2 (the "1905 Act") (repealed 1953); *see also* Or. Gen. Laws, 1905, ch. 5, §§ 1-2 (authorizing the United States to both raise and lower the lakes associated with the Klamath River Basin and also to use the beds of those lakes for water storage in connection with irrigation projects).

The Klamath Project is managed and operated by the Secretary of the Interior, through the United States Bureau of Reclamation (the "Bureau"). The Project provides water to about 240,000 acres of irrigable crop lands. It also provides water to several national wildlife refuges in the Klamath River Basin, including the Lower Klamath and Tule Lake National Wildlife Refuges. Over the years, the Bureau has entered into various types of contracts with water districts and individual water users who wish to receive deliveries of Project water for irrigation purposes. In one way or another, each of the plain-

tiffs receives delivery of water from the Klamath Project for irrigation purposes.

## II.

In light of its dual purposes of serving agricultural uses and providing for the needs of wildlife, the Klamath Project is subject to the requirements of the Endangered Species Act. *See* Pub. L. No. 93-205, 87 Stat. 884 (1973) (codified, as amended, at 16 U.S.C. § 1531 *et seq.*) (the "ESA"). In a 1999 Ninth Circuit decision, the interests of Project water users were declared subservient to the ESA, the result being that, as necessary, the Bureau has a duty to control the operation of the Link River Dam in order to satisfy the requirements of the ESA. *See Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1213 (9th Cir. 1999) (noting that the ESA was enacted to "halt and reverse the trend toward species extinction, *whatever the cost.*") (emphasis added) (internal citations omitted), amended by 203 F.3d 1175 (9th Cir. 2000).

Pursuant to the ESA, the Bureau has an obligation not to engage in any action that is likely to jeopardize the continued existence of an endangered or threatened species or result in the destruction or adverse modification of the critical habitat of such a species. *See* 16 U.S.C. § 1536(a)(1). As a result, the Bureau is required to perform biological assessments to determine the impact of the diversion of Klamath Project water for irrigation purposes upon endangered and threatened species and to adjust water delivery to minimize the impact upon the habitat of such species. *See* 16 U.S.C. § 1536(a)(2), (c)(1).

Shortly after the Ninth Circuit's ruling in *Patterson*, several environmental organizations filed suit against the Bureau in federal court for alleged failure to comply with the ESA in preparing Klamath Project operating plans. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau*

*of Reclamation*, 138 F. Supp. 2d 1228, 1238 (N.D. Cal. 2001). During the pendency of that case, in the spring of 2001, severe drought conditions caused the Bureau to reevaluate its planned water deliveries for the year 2001. Several federal agencies indicated that water levels in the Klamath River Basin had become so low as to threaten the survival of certain endangered species, including the coho salmon, the shortnose suckerfish, and the Lost River suckerfish. *See Takings Decision*, 67 Fed. Cl. at 512-13. In due course, the Bureau forwarded biological assessments of the Project's proposed operations to the two agencies authorized to issue final biological opinions for those species; the National Marine Fisheries Service (for coho salmon) and the Fish and Wildlife Service (for suckerfish). The two agencies performed their analyses and ultimately issued final biological opinions concluding that the Project's proposed operations for 2001 threatened the continued existence of the species in question. *Id.* at 513. As statutorily required, both opinions presented alternatives to address the threat to the three species. These alternatives included reducing the water available for irrigation from Upper Klamath Lake during 2001 when flows were below certain levels. *Id.* (citing 16 U.S.C. § 1536(b)(3)(A)). In addition, at this time, the Bureau was subject to a preliminary injunction order issued by the U.S. District Court for the Northern District of California in the *Pacific Coast* case. The order barred the delivery of Klamath Project water for irrigation purposes when water flow was below certain minimum levels, until the Bureau complied with ESA consultation requirements. *See Pac. Coast Fed'n of Fishermen's Ass'ns*, 138 F. Supp. 2d at 1251.

On April 6, 2001, the Bureau issued a revised operating plan for the Klamath Project that terminated delivery of irrigation water for the year 2001. *Takings Decision*,

67 Fed. Cl. at 513.  As a result, the Bureau ceased water deliveries from Upper Klamath Lake from April through July of 2001, when it was able to release some water to its users, including plaintiffs.  *See Takings Decision*, 67 Fed. Cl. at 513 n.10.

Following the Bureau's cessation of irrigation water deliveries in April 2001, various Project users, including several of the plaintiffs in this case, filed a breach of contract suit against the United States in the U.S. District Court for the District of Oregon.  *See Kandra v. United States*, 145 F. Supp. 2d 1192, 1196 (D. Or. 2001). The suit was dismissed in October 2001 after the court denied the users' motion for a preliminary injunction against the halting of water deliveries.  *Id.* at 1211.

III.

A

On October 11, 2001, plaintiffs brought this action in the Court of Federal Claims.  In their Second Amended Complaint, which was filed on January 31, 2005 ("Complaint"), plaintiffs assert three claims against the United States.[2]  First, they allege that, when the Bureau halted the delivery of water in 2001, it took their water rights for public use without just compensation, in violation of the Fifth Amendment to the Constitution.  Complaint, ¶¶ 32-33.  Second, they allege that the Bureau's action impaired their water rights without just compensation, in violation

---

[2] Several organizations, including defendant-appellee Pacific Coast Federation of Fishermen's Associations ("PCFFA"), moved for leave to intervene in the suit as a matter of right, based on asserted interests relating to the allocation and ownership of Klamath Project water. The court ruled that only PCFFA was entitled to intervene.  *See Klamath Irrigation Dist. v. United States*, 64 Fed. Cl. 328, 331, 336 (2005).

of the Klamath Basin Compact. *Id.* at ¶¶ 38-39. The Compact, which was entered into between Oregon and California for the division of Klamath Project water, received the consent of Congress. 71 Stat. at 497. It states that "the United States shall not, without payment of just compensation, impair any rights to the use of water for [domestic or irrigation purposes] within the Upper Klamath River Basin." *Id.* at 507. Lastly, plaintiffs allege that, when the Bureau halted the delivery of water, its action breached water service contracts with the plaintiff districts. Complaint, ¶ 47. Among other things, the individual plaintiffs in the case claim rights as third-party beneficiaries of the contracts between the Bureau and the districts. *Id.* at ¶ 46.

Several plaintiffs also asserted equitable or beneficial property interests in the use of Klamath Project water through claims based on patent deeds and claims based on state water permits.[3] Five landowner plaintiffs—Fred A. Robison, Albert Robison, Mark Trotman, Lonny Baley, and Baley Trotman Farms—claim they were granted title to their land in "patent deeds" and that once they filed applications for the beneficial use of Klamath Project water, the deeds conveyed their land to them together with the right to the use of water from the Klamath Reclamation Project as an appurtenance to the land. *See*

---

[3] The United States issued patent deeds to individual water users who filed an "Application for Permanent Water Right-Form A" and an affidavit "attesting to the fact that [the user] had put Klamath Project water to beneficial use." Once an applicant met these requirements, he or she was issued a patent deed conveying land "together with the right to the use of water from the Klamath Reclamation Project as an appurtenance" to the land. *Takings Decision*, 67 Fed. Cl. at 512. In addition, the State of Oregon issued water rights permits to certain districts after the state repealed the 1905 Act in 1953. *Id.*

*Takings Decision*, 67 Fed. Cl. at 512. Two plaintiffs, the Klamath Drainage District and the Klamath Hills District Improvement Company, assert property interests based on water permits issued by the State of Oregon. They claim that the permits demonstrate ownership of a "vested and determined" state law water right. *Id.*

Under Oregon's Water Rights Act of 1909, Or. Rev. Stat. §§ 539.005-240 (the "Water Rights Act"), once all competing water rights claims are filed and entered into state records, they are made subject to a final determination of rights through a statutory adjudication process. *See* Or. Rev. Stat. §§ 539.240(8), 539.010-240. Pertinent to this case, the Water Rights Act authorizes the adjudication of federal and state law water rights vesting prior to passage of the 1905 Act. *Id.* In 1976, the Klamath Basin Adjudication (the "Adjudication") was initiated to determine water rights in the Klamath Basin. On November 13, 2003, the Court of Federal Claims ruled that plaintiffs were barred from asserting claims based on rights, titles, or interests that could be subject to determination in the Adjudication, which remains pending. *See Takings Decision*, 67 Fed. Cl. at 514 (citing the court's November 13, 2003 summary judgment order).

B

The Fifth Amendment to the United States Constitution proscribes the taking of private property "for public use, without just compensation." U.S. Const. amend. V, cl. 4. When evaluating whether governmental action constitutes a taking, a court employs a two-part test. First, the court determines whether the claimant has identified a cognizable Fifth Amendment property interest that is asserted to be the subject of the taking. Second, if the court concludes that a cognizable property interest exists, it determines whether the government's

action amounted to a compensable taking of that property interest. *See, e.g.*, *Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1364 (Fed. Cir. 2009); *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004); *see also Air Pegasus of D.C., Inc. v. United States*, 424 F.3d 1206, 1212-13 (Fed. Cir. 2005).

In due course, the parties filed cross-motions for summary judgment on the threshold question of whether plaintiffs have property interests in Klamath Project water rights cognizable under the Fifth Amendment. In the *Takings Decision*, the Court of Federal Claims granted the government's motion for summary judgment and held that plaintiffs had failed to assert cognizable property interests in Klamath Project water for purposes of their taking claims, their Compact claims, or other asserted property rights. *See Takings Decision*, 67 Fed. Cl. at 540.

In determining whether a party has asserted a cognizable property interest for Fifth Amendment purposes, a court must look to "existing rules and understandings and background principles derived from an independent source, such as state, federal, or common law, [that] define the dimensions of the requisite property rights for purposes of establishing a cognizable taking." *Air Pegasus*, 424 F.3d at 1213 (internal quotations and citations omitted). In the *Takings Decision*, the Court of Federal Claims rejected plaintiffs' argument that the Reclamation Act created property interests for plaintiffs owning land appurtenant to Klamath Project waters, holding that the statute and its legislative history clearly intended for state law to govern plaintiffs' asserted usufruct property rights, i.e., the right to the use of the water that had been appropriated by the federal government. 67 Fed. Cl. at 516-519. The court also rejected plaintiffs' contention that Supreme Court cases recognizing usufructuary rights

in water sources created by Section 8 of the Reclamation Act established property rights in Klamath Project water under federal law.[4] The court noted that each of the cases cited by plaintiffs applied the law of the relevant state or states providing for such rights. *Id.* at 519-523, *discussing Ickes v. Fox*, 300 U.S. 82, 94 n.3 (1937) (relying on contracts and a Washington statute); *Nebraska v. Wyoming*, 325 U.S. 589, 612-15 (1945) (applying Nebraska and Wyoming law); *Nevada v. United States*, 463 U.S. 110, 122, 126 (1983) (applying Nevada law). The court ruled that Oregon law, therefore, was the governing law for determining the existence of property rights in Klamath Project water. *Id.* at 523.

The Court of Federal Claims next considered whether Oregon law established any property rights for the plaintiffs, as users of Klamath Project water, as against the United States. Focusing on the 1905 Act, the court noted that the statute expressly provided the procedure by which the United States could appropriate the waters deemed necessary for the Klamath Project. Once the

---

[4] Section 8 of the Reclamation Act states that:

[N]othing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the water thereof: Provided, *That the right to use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right.*

32 Stat. 388, 390 (codified at 43 U.S.C. §§ 372, 383) (emphasis added).

United States had complied with all of the statutory requirements for acquiring water rights, the court reasoned, the 1905 Act vested the United States with title to all the waters unappropriated as of the date of filing, and those waters could not be subject to further appropriation or adverse claims except as permitted by the United States. *See id.* at 523-25 (citing *In re Waters of the Umatilla River*, 88 Or. 376, 168 P. 922, 925 (Or. 1917) (under the 1905 legislation, the filing of notice by the United States, upon compliance with the various procedural strictures of the statute, "vested the United States with title to all the then unappropriated water of the Umatilla River.")). The court acknowledged the Oregon legislation could not displace any water rights which had vested prior to the acceptance by the United States of the provisions of the statute, but found no evidence of such pre-1905 rights still existing. Thus, because the United States had perfected its property rights by complying with necessary procedural requirements, the court concluded that "pursuant to relevant Oregon law, in 1905, the United States obtained rights to the unappropriated water of the Klamath Basin and associated tributaries." *Id.* at 526.

The court recognized, however, that this conclusion did not answer the question whether any of the individual plaintiffs held water rights that predated the government's 1905 notice appropriating water for the Klamath Project—specifically, water rights that were already appropriated as of the date of the government's notice of appropriation. It also recognized that it did not answer the question whether any of the individual plaintiffs held water rights that post-dated the 1905 notice that were obtained from the United States. *Id.*

Addressing first water rights that predated the government's 1905 appropriation notice, the Court of Federal

Claims noted that plaintiffs did not seriously dispute that these water rights had been acquired by the government and integrated into the Klamath Project. *Id.* The court also noted, however, the contention that alleged pre-1905 rights of at least seven plaintiffs[5] had been exchanged for a perpetual right to receive water from the Project. In the court's view, the record revealed that these alleged exchanges had arisen from a series of post-1905 contracts with the United States, under which the government made various commitments regarding Project water. *Id.* at 527.

The court next considered whether, after 1905, plaintiffs obtained any property rights in Klamath Project water from the United States. The court classified the asserted interests into the following types: rights based on contracts with the United States; rights based on applications for beneficial use and patent deeds granted by the United States to individual users; and rights based on state water permits (involving the Klamath Drainage District and the Klamath Hills District Improvement Company). *Id.* at 530-31. The court first determined that any rights obtained by contract with the United States, including rights of individual users as third-party beneficiaries of district contracts, were subject to contract, rather than takings, remedies. *Id.* at 532-35. In that regard, the court noted that briefing on the contract issue had been stayed and that the ultimate issue of whether the Bureau had breached the district contracts in question remained to be decided. *Id.* at 535.

---

[5] The Van Brimmer Ditch Company, Michael J. Byrne, Daniel W. Byrne, Daniel G. Chin, Deloris D. Chin, Cheryl M. Moore and James L. Moore. *See* 67 Fed. Cl. 526-27 n.38.

The court next determined that any rights obtained contractually by patent deeds or state water permits were junior in priority to the rights of the United States in carrying out its Klamath Project duties. *Id.* at 538-39. The court reasoned that the United States could not have taken rights to receive water based on patent deeds and water permits with priority dates after the 1905 appropriation by the United States of water for the Project. This determination rested on the prior appropriation doctrine and the Water Rights Act's recognition of claims of water rights according to the "first in time, first in right" rule.[6] *Id.* at 539 (citing Or. Rev. Stat. §§ 537.120, 537.160, 537.250). Accordingly, the court concluded that any water rights of plaintiffs arising from patent deeds and water permits were subservient to the prior interests of the United States (as well as to those of various Native American tribes). *Id.* Finally, the court determined that the Compact, as a contract between California and Oregon to which the United States consented, did not alter this analysis in any manner so as to impair the rights of the United States "over and to the waters of the Klamath River Basin." *Id.* Having ruled that neither federal nor Oregon state law provided plaintiffs with any property rights as against the United States that were compensable under the Fifth Amendment or the Compact, the

---

[6] Under the prior appropriation doctrine, a water rights holder who appropriates water for beneficial use is granted priority for that use in times of shortage over other appropriators who made later use of the water. *See Takings Decision*, 67 Fed. Cl. at 539 (citations omitted). The doctrine prioritizes water rights according to the "first in time, first in right" rule, where claims of rights to the use of water are prioritized so that the senior-most (i.e., oldest) rights holder is entitled to have his or her entitlement fully satisfied before the next rights holder can appropriate water for his or her needs. *Id.*

court entered judgment in favor of the United States on the takings and Compact claims. *Id.* at 540.

Subsequently, in the *Contract Decision*, the court turned to the unresolved matter of whether the United States' failure to deliver irrigation water in 2001 breached any of plaintiffs' contract rights, asserted directly by the district plaintiffs and indirectly by the landowning plaintiffs as beneficiaries of the district plaintiffs' contracts. The court emphasized that many (though not all) of the contracts had provisions absolving or limiting the United States' liability for Klamath Project water shortages. 75 Fed. Cl. at 681-82. However, the court stated that it did not have to resolve the bounds of the government's exemption from liability on that basis, because the "controlling issue" in the case was whether the sovereign acts doctrine foreclosed government liability as to plaintiffs' breach of contract claims. *Id.* at 682.

The court first noted that the sovereign acts doctrine immunizes the federal government for any and all acts taken in its sovereign capacity, rather than its capacity as a contractor. The court then rejected plaintiffs' argument that the sovereign acts doctrine did not apply because the Bureau was not compelled "as a sovereign" by the ESA to diminish water deliveries in 2001. *Id.* at 683-85. The court reasoned that because the ESA was a general statute enacted for public benefit, the United States could not be held liable for an obstruction to its performance as a contractor that resulted from its public and general acts of compliance as a sovereign. *Id.* at 683-84 (citing *Horowitz v. United States*, 267 U.S. 458, 461 (1925)).

The court noted that compliance with the ESA was mandatory upon the government and that the Bureau modified the Klamath Project operating plan in 2001 in order to protect the endangered species of fish, not to

provide an excuse for decreasing the amount of water provided to plaintiffs in its role as government contractor. *Id.* at 684-85. On this basis, the court deemed the government was immunized from liability for breach of contract based on sovereign acts that impacted its "subservient" performance of the water contracts at issue. *Id.* at 686-87.

In addition, the court rejected plaintiffs' argument that, even if the sovereign acts doctrine did apply, it did not excuse the government's breach of the water supply contracts because the government had failed to show the contract was impossible to perform. The court acknowledged that, in *United States v. Winstar Corp.*, 518 U.S. 839 (1996), four justices deemed impossibility of performance a requirement of a sovereign act defense. The court reasoned, however, that the Court's non-majority opinion was not binding. *See Contract Decision*, 75 Fed. Cl. at 691. Accordingly, the court concluded that the common law doctrine of impossibility of performance is not a component of the sovereign acts doctrine and that the latter doctrine therefore provided a complete defense to plaintiffs' breach of contract claims. *Id.* at 695.

Based on the *Takings Decision* and the *Contract Decision*, the Court of Federal Claims entered judgment in favor of the United States and dismissed the Complaint. Plaintiffs timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## IV.

Following briefing and oral argument, we concluded that Oregon property law was pertinent to the question of whether plaintiffs possessed property rights in Klamath Project water. We therefore certified three questions to the Oregon Supreme Court. *See Certification Order*. Pending action by the Oregon Supreme Court, we with-

held decision on the takings, Compact, and breach of contract claims.

Our first certified question asked whether, assuming that Klamath Project water was deemed appropriated by the United States pursuant to the 1905 Act, the statute precluded irrigation districts from acquiring a beneficial or equitable property interest in the water right acquired by the United States. *Id.* at 1377-78. The second question asked whether, in light of the 1905 Act, landowners who receive and put to beneficial use Klamath Project water have a beneficial or equitable property interest appurtenant to their land in the water right acquired by the United States, and whether district plaintiffs who receive Project water have a beneficial or equitable property interest in the water right acquired by the United States. *Id.* at 1378. The third question asked, with respect to surface rights where appropriation was initiated under Oregon law prior to February 24, 1909, and where such rights were not within any previously adjudicated area of the Klamath Basin, whether Oregon law recognizes any property interest, whether legal or equitable, in the use of Project water that is not subject to the Adjudication.[7] *Id.*

The Oregon Supreme Court accepted the case for certification, and on March 11, 2010, the court rendered its decision in response to the *Certification Order*. *See Certification Decision*. The *Certification Decision* was filed with this court on March 22, 2010.

---

[7]    Under the Water Rights Act, all water rights "that had vested prior to 1909, but had never been subject to a judicial determination" were "left intact as 'undetermined vested rights.'" *United States v. Oregon*, 44 F.3d 758, 764 (9th Cir. 1994) (quoting Or. Rev. Stat. § 536.007(11)).

The Oregon Supreme Court answered our three questions as follows:

1. The 1905 [Act] did not preclude plaintiffs from acquiring an equitable or beneficial property interest in a water right to which the United States holds legal title. Moreover, under the 1905 [A]ct, a formal written release from the United States is not necessary for plaintiffs to have acquired an equitable or beneficial property interest in the water right that the United States appropriated.

2. Under Oregon law, whether plaintiffs acquired an equitable or beneficial property interest in the water right turns on three factors: whether plaintiffs put the water to beneficial use with the result that it became appurtenant to their land, whether the United States acquired the water right for plaintiffs' use and benefit, and, if it did, whether the contractual agreements between the United States and plaintiffs somehow have altered that relationship. In this case, the first two factors suggest that plaintiffs acquired a beneficial or equitable property interest in the water right to which the United States claims legal title, but we cannot provide a definitive answer to the court's second question because all the agreements between the parties are not before us.

3. To the extent that plaintiffs assert only an equitable or beneficial property interest in the water right to which the United States claims legal title in the [A]djudication, plaintiffs are not "claimants" who must appear in that adjudication or lose the right. As a general rule, equitable or beneficial property interests in a water right to which someone else claims legal title are not sub-

ject to determination in a state water rights adjudication.

*See Certification Decision*, 227 P.3d at 1169.

By letter dated April 5, 2010, we asked the parties to "advise the court as to how they think the court should proceed in this matter in view of the Oregon Supreme Court's decision." *See* Letter from Jan Horbaly, Clerk of the Court, in Case No. 2007-5115, Docket No. 100. The parties have now submitted responsive briefs and presented oral argument on that question.

DISCUSSION

I.

A

Plaintiffs argue that the *Certification Decision* compels reversal of the *Takings Decision*. Plaintiffs contend that, in light of the Oregon Supreme Court's answers to our questions, it is clear that the *Takings Decision* is based on two erroneous rulings: (1) that plaintiffs lacked beneficial or equitable property interests under Oregon law; and (2) that the 1905 Act precluded plaintiffs from acquiring equitable or beneficial property interests in Klamath Project water rights. *See* Appellants' Suppl. Br. at 2. Turning to the Oregon Supreme Court's statement in answering certified question 2 that it lacked all the information (i.e., record of contracts) from which it could determine if plaintiffs had contractually given away any of their water rights, plaintiffs state that "there is absolutely no evidence in the record that the individual water users contractually bargained away or relinquished their vested water rights to the United States—and substantial evidence that they did not, not the least of which is the fact that none of the named individual Klamath Irrigators has a contract with the Government." *Id.* at 2-3.

Finally, plaintiffs urge that the Oregon Supreme Court's answer to our third certified question compels the conclusion that the beneficial or equitable rights at issue in this case are not involved in the Adjudication. The significance of this point is that plaintiffs who have filed claims in the Adjudication have agreed to proceed in the Court of Federal Claims litigation on the understanding that they are barred by the court's November 13, 2003 order from making any claims or seeking any relief based on rights, titles, or interests that are, or may be, subject to determination in the Adjudication. *See Takings Decision*, 67 Fed. Cl. at 514.

For its part, the United States contends that, in the wake of the *Certification Decision*, we should affirm the *Takings Decision*. The government takes this position based on its assessment of the Oregon Supreme Court's analytical approach to our second certified question. Addressing that question, the court stated:

> As we understand the second question, it asks whether beneficial use alone is sufficient to acquire a beneficial or equitable property interest in a water right to which another person holds legal title. The answer to that question, as we have restated it, is "no." Beneficial use is a necessary but not a sufficient condition to acquire a beneficial or equitable property interest in a water right.

*Certification Decision*, 227 P.3d at 1160. From there, the court went on to state the two additional factors that must be considered in determining whether plaintiffs acquired a beneficial or equitable property interest in the water rights at issue. Those factors are "whether the United States acquired the water right for plaintiffs' use and benefit, and, if it did, whether the contractual agree-

ments between the United States and plaintiffs somehow have altered that relationship." *Id.* at 1169.

The government argues that, by restating the second question and then answering it in the negative, the Oregon Supreme Court rejected the arguments made by plaintiffs on appeal. *See* United States Appellee's Suppl. Br. at 10-11. Although the government recognizes that the court spelled out the two additional factors under Oregon law that must be considered in determining whether a beneficial or equitable property interest has been acquired, it takes the position that the Oregon Court's three-factor test embodies a new legal theory that has not heretofore been argued by plaintiffs. *Id.* at 11. As we understand it, the government's position is that, up to now, plaintiffs have not argued they possess equitable rights to Klamath Project water based upon the operation of state law (the Oregon Supreme Court's three-factor test), but, rather, that they possess such rights by virtue of a uniform, federally-established rule that is not dependent on or limited by their contracts with the United States. *Id.* at 8, 11. For this reason, the government urges that plaintiffs have "waived any claim to property rights based on the Oregon court's three-factor analysis." *Id.* at 11. The government states that a remand by this court to the Court of Federal Claims for consideration of the three-factor test would be inappropriate because the test rests on a theory that is "fundamentally different" from the one heretofore advanced by plaintiffs. *Id.* at 14-15.

In the alternative, the government argues that we should remand to the Court of Federal Claims for a determination of whether, under the Oregon Supreme Court's three-factor test, any of the plaintiffs has a compensable property interest in Klamath Project water rights. *Id.* at 17-21. The government states, however,

that even if we generally remand the takings and Compact claims, we should nonetheless affirm the judgment with respect to plaintiff Van Brimmer Ditch Company's takings claim, and plaintiffs' takings claims based upon patent deeds and state water permits. *Id.* at 21-22. According to the government, the Van Brimmer Ditch Company's claim is identical to the claim it has presented for determination in the Adjudication and is therefore barred from this case by the Court of Federal Claims' November 13, 2003 order. *Id.* at 21. Turning to claims based on patent deeds and the claims of the Klamath Drainage District and the Klamath Hills District Improvement Company based on state water permits, the government contends that plaintiffs have not challenged the *Takings Decision* with respect to those claims. *Id.* at 22.

B

In our view, the Oregon Supreme Court's answers to our three certified questions compel further proceedings. The court's first answer makes clear that the district plaintiffs are not precluded, under Oregon's 1905 Act, from acquiring a beneficial or equitable property interest in Klamath Project water that was appropriated by the United States under that statute. *See Certification Decision*, 227 P.3d at 1157-60. The Oregon Supreme Court stated: "[W]e find nothing in the text and context of the 1905 [Act] that would preclude plaintiffs from acquiring a beneficial or equitable property interest in the water right appropriated by the United States." *Id.* at 1160.

The Oregon Supreme Court did not answer our second question in yes-or-no terms. Instead, it restated the question and responded "no" to whether beneficial use alone is sufficient to acquire a beneficial or equitable property interest in a water right to which another person

holds legal title.  The court explained why, under Oregon law, district plaintiffs who receive Klamath Project water and individual plaintiffs who have put to beneficial use Project water appurtenant to their land do not, *on that basis alone*, have a beneficial or equitable property interest in the water.  The court stated:  "Beneficial use is a necessary but not a sufficient condition to acquire a beneficial or equitable property interest in a water right." *Id.* at 1160.

Explaining its answer, the court began by noting that Oregon law has long recognized the distinction between equitable title and legal title to property, with the result that one party may hold legal title to a water right while another holds equitable title.  *Id.* at 1161 (citing *Fort Vannoy Irrigation Dist. v. Water Res. Comm'n*, 345 Or. 56, 86, 188 P.3d 277, 295 (2008) (irrigation district holds legal title to a water right as trustee while its members hold equitable title as beneficiaries); *In re Water Rights of Willow Creek*, 119 Or. 155, 195, 199, 236 P. 487, 500 (1925) (corporation held appropriated water right in trust for use and benefit of shareholders who put the water to beneficial use)).  The court reasoned that beneficial use alone does not always give the user a property interest in a water right appropriated by another, however.  Citing *In re Waters of Walla Walla River*, 141 Or. 492, 497-98, 16 P.2d 939, 941 (1933), it stated that two other factors, in addition to beneficial use, must be considered in determining whether a beneficial or equitable property interest exists:  the relationship between the parties as well as any contractual relationships between them.  *See Certification Decision*, 227 P.3d at 1162.  The court pointed to the United States Supreme Court's consideration of the three factors in *Nevada v. United States*, where the Court stated:  "[T]he beneficial interest in the rights confirmed to the Government resided in the owners of the land

within the Project to which these water rights became appurtenant upon the application of Project water to the land. As in *Ickes v. Fox* and *Nebraska v. Wyoming*, the law of the relevant State and the contracts entered into by the landowners and the United States make this point very clear." 463 U.S. at 126.

Having found the *Nevada* Court's analysis "both persuasive and consistent with Oregon law," the Oregon Supreme Court adopted the three-factor test in this case. *See Certification Decision*, 227 P.3d at 1163. Applying that test, the court concluded that, as a matter of Oregon law, (1) plaintiffs who have taken Klamath Project water, applied it to their land, and put it to beneficial use have acquired a water right appurtenant to their land, *id.* at 1163; and (2) the relationship between the United States, as appropriator of the Klamath Project water, and plaintiffs as water users is similar to that of a trustee and beneficiary, *id.* at 1164-65. As for the last factor, the contractual relationships between the United States and plaintiffs, the court stated that whether the parties entered into agreements that "clarified, redefined, or even altered" the aforementioned trustee-beneficiary relationship "requires a full consideration of the agreements between plaintiffs and the United States." *Id.* at 1165. Because it did not have the pertinent contracts before it, the court stated that it was not in a position to undertake that analysis. *Id.* at 1165-66.

We do not agree that plaintiffs are barred from proceeding under the three-factor test articulated by the Oregon Supreme Court. We have reviewed plaintiffs' July 16, 2007 brief in this court ("Blue Brief"), the government's October 25, 2007 brief in response ("Red Brief"), and plaintiffs' November 13, 2007 reply brief ("Grey Brief"). Based upon that review, we have no difficulty concluding that plaintiffs have consistently argued that

the beneficial/equitable rights to project water which they claim arose by operation of state law. *See* Blue Brief at 24-43, Red Brief at 32-42, Grey Brief at 5-9.[8] Moreover, in response to our certified question 2, the Oregon Supreme Court has told us what the pertinent law of Oregon is. The case should now proceed under the Oregon Court's three-factor test for determining whether plaintiffs hold beneficial or equitable property interests in Klamath Project water.[9]

Finally, the court's answer to our third question makes clear that plaintiffs may assert, under Oregon law, beneficial or equitable property interests in Klamath Project water to which the United States claims legal title; plaintiffs need not pursue those claims in the Adjudication. *Certification Decision*, 227 P.3d at 1166-68. The Oregon Supreme Court stated: "The answer to the Federal Circuit's third question is 'yes.' A person asserting only a beneficial or equitable property interest in a water right is not a 'claimant' who must appear in the Klamath Basin adjudication and file a claim to determine that

---

[8] The beneficial or equitable water rights at issue in this case are in the nature of usufructuary rights. Such a right is chiefly a right of use, not a right of possession or other right associated with land ownership, and has been acknowledged as a cognizable property interest. *Dugan v. Rank*, 372 U.S. 609, 625-26 (1963); *Washoe County, Nevada v. United States*, 319 F.3d 1320, 1322 (Fed. Cir. 2003) ("Although a water right is property subject to constitutional protection, it is usufructuary in nature, meaning that it is a 'right to use' water in conformance with applicable laws and regulations.")

[9] We do not agree with the government that plaintiffs have not challenged the Takings Decision insofar as it relates to claims based on patent deeds and the claims of the Klamath Drainage District and the Klamath Hills District Improvement Company based on state water rights. *See* Blue Brief at 43-45; Grey Brief at 22-23.

interest." *Id.* at 1166. Accordingly, because Oregon law does not preclude plaintiffs from acquiring a beneficial or equitable interest in Project water rights held by the United States, and because plaintiffs' claims thereto need not be determined in the Adjudication, they should be considered in this case.[10]

In sum, we remand plaintiffs' takings and Compact claims for (1) determination, based on the *Certification Decision*, on a case-by-case basis, of any outstanding property interest questions; and (2) determination on the merits, on a case-by-case basis, of all surviving takings and Compact claims. On remand, the Court of Federal Claims should proceed as follows: First, it should determine, for purposes of plaintiffs' takings and Compact claims, whether plaintiffs have asserted cognizable property interests. In making that determination, the court should direct its attention to the third part of the three-part test set forth by the Oregon Supreme Court in response to our certified question 2. That is because it is not disputed that, in this case, the first two parts of the three-part test have been met. Specifically, the parties do not dispute that plaintiffs have put Klamath Project water to beneficial use and that the United States acquired the pertinent water rights for plaintiffs' use and benefit. As far as the third part of the three-part test is concerned, the court should address whether contractual agreements between plaintiffs and the government have clarified, redefined, or altered the foregoing beneficial relationship so as to deprive plaintiffs of cognizable property interests for purposes of their takings and Compact

---

[10] We leave it to the Court of Federal Claims to determine, in the first instance, whether the claim of the Van Brimmer Ditch Company is not properly before the court because it is identical to the claim the company has presented in the Adjudication.

claims. In that regard, as seen, plaintiffs assert that there are no such contracts.[11] On remand, the Court of Federal Claims should give the government the opportunity to demonstrate how plaintiffs' beneficial/equitable rights to the use of Klamath Project water have been clarified, redefined, or altered. In that context, it will be the government's burden to demonstrate with specificity how the beneficial/equitable rights of one or more plaintiffs have been clarified, redefined, or altered.[12] After the government has come forward with its showing, plaintiffs will have the opportunity to respond. To the extent the Court of Federal Claims determines that one or more plaintiffs have asserted cognizable property interests, it then should determine whether, as far as the takings and Compact claims are concerned, those interests were taken

---

[11]   At oral argument on November 18, 2010, the government acknowledged that there are no contracts that serve as a complete surrender of plaintiffs' rights.

[12]   It is plaintiffs' burden to establish cognizable property interests for purposes of their takings and Compact claims. *Air Pegasus*, 424 F.3d at 1212-13; *American Pelagic Fishing Co.*, 379 F.3d at 1372. In that regard, with respect to the third part of the Oregon Supreme Court's answer to certified question 2, plaintiffs assert there are no contracts which have clarified, redefined, or altered their property rights. On remand, if the government contends that there are such contracts, it will have the burden of coming forward with appropriate evidence. *See Nat'l Commc'ns Ass'n, Inc. v. AT & T Corp.*, 238 F.3d 124, 129-31 (2d Cir. 2001) ("[A]ll else again being equal, courts should avoid requiring a party to shoulder the more difficult task of proving a negative. 'The general rule is that the party that asserts the affirmative of an issue has the burden of proving the facts essential to its claim.'") (quoting *Auburndale State Bank v. Dairy Farm Leasing Corp.*, 890 F.2d 888, 893 (7th Cir. 1989)).

or impaired.  That determination will turn on existing takings law.[13]

## II.

## A

Turning to the breach of contract claims, plaintiffs contend that the Court of Federal Claims erred in not holding impossibility of performance a threshold requirement the government must meet when asserting the sovereign acts defense.  Although plaintiffs acknowledge that the Supreme Court's *Winstar* plurality opinion commanded the votes of only four Justices on the impossibility of performance issue, they argue that, in *Carabetta Enterprises, Inc. v. United States*, 482 F.3d 1360 (Fed. Cir. 2007), we relied upon the *Winstar* plurality holding.  Plaintiffs argue that the government should not be absolved from liability based on the sovereign acts doctrine for breach of contract without first proving impossibility of performance, which it contends the government failed to do in this case.  *See* Appellants' Br. at 49-52.

Responding, the government argues that the Court of Federal Claims correctly held that the sovereign acts doctrine provides a complete defense to plaintiffs' breach of contract claims.  In the government's view, the "ESA compelled the Bureau to reduce irrigation deliveries in 2001." *Contract Decision*, 75 Fed. Cl. at 686.

---

[13]   On remand, counsel for plaintiffs should confirm which plaintiffs are asserting takings and Compact claims and which plaintiffs are asserting breach of contract claims.

B

The sovereign acts doctrine is designed to balance "the government's need for freedom to legislate with its obligation to honor its contracts." *Winstar*, 518 U.S. at 895-96. Under the doctrine, "the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1574 (Fed. Cir. 1997) (quoting *Horowitz v. United States*, 267 U.S. 458, 461 (1925)). The government is not liable for breach of contract whenever it takes any generally applicable action in its sovereign capacity that incidentally frustrates performance of a contract to which it is a party. *Horowitz*, 267 U.S. at 461. Discussing the sovereign acts doctrine in *Winstar*, Justice Souter, joined by Justices Stevens, O'Connor, and Breyer, stated:

> As *Horowitz* makes clear, that defense simply relieves the Government as contractor from the traditional blanket rule that a contracting party may not obtain discharge if its own act rendered performance impossible. But even if the Government stands in the place of a private party with respect to "public and general" sovereign acts, it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach.

518 U.S. at 904.

We have stated that "[a]lthough the portion of the principal [*Winstar*] opinion addressed to the sovereign acts doctrine had the support of only four (and as to some portions, only three) justices, this court has treated that opinion as setting forth the core principles underlying the

sovereign acts doctrine." *Conner Bros. Const. Co., Inc. v. Geren*, 550 F.3d 1368, 1374 (Fed. Cir. 2008) (citing *Carabetta*, 482 F.3d at 1365; *Yankee Atomic*, 112 F.3d at 1574-77). Relevant to this case, in *Carabetta*, we stated that even if the sovereign acts defense applies, "it does not follow that discharge will always be available, for the common-law doctrine of impossibility imposes additional requirements before a party may avoid liability for breach." 482 F.3d at 1365 (quoting *Winstar*, 518 U.S. at 904). *See also*, *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1294 (Fed. Cir. 2002) (stating that contract performance by the government is excused under the sovereign acts defense when "it is objectively impossible"). We reaffirmed this requirement in *Casitas Municipal Water District v. United States*, 543 F.3d 1276, 1287 (Fed. Cir. 2008), stating that "performance by the government is excused under the sovereign acts defense only when the sovereign act renders the government's performance impossible."

The sovereign acts defense involves the following two-part test:

> [F]irst [we ask] whether the sovereign act is properly attributable to the Government as contractor. That is, is the act simply one designed to relieve the Government of its contract duties, or is it a genuinely public and general act that only incidentally falls upon the contract? If the answer is that the act is a genuine public and general act, the second part of the test asks whether that act would otherwise release the Government from liability under ordinary principles of contract law. This second question turns on what is known in contract law as the impossibility (sometimes impracticability) defense.

*Stockton East Water Dist. v. United States*, 583 F.3d 1344, 1366 (Fed. Cir. 2009) (internal quotations and citations omitted).

Turning to the first question, we agree with the Court of Federal Claims that, in this case, the Bureau's halting of water deliveries in response to the biological assessments of the National Marine Fisheries Service and the Fish and Wildlife Service constituted a genuine public and general act that only incidentally fell upon the contracts at issue. We concluded in *Casitas* that "the [agency's biological] opinion and the decision of the [Bureau] to adopt the [biological] opinion are sovereign acts." 543 F.3d at 1288. In reaching that conclusion, we rejected the argument that narrowly cabined a public and general sovereign act to only the ESA itself, holding instead that both the agency's issuance of a formal biological opinion and the Bureau's decision to adopt that opinion are governmental actions that are "sovereign in character [so that] the sovereign acts doctrine may be invoked." *Id.* at 1287-88. We therefore find no error in the Court of Federal Claims' ruling that the Bureau's withholding of water releases in 2001 was a public and general act.

However, the Court of Federal Claims failed to undertake the second part of the sovereign acts doctrine analysis, which addresses whether the sovereign act would otherwise release the Government from liability under ordinary principles of contract law. *See Stockton*, 583 F.3d at 1366. This implicates the impossibility of performance component of the sovereign acts defense, which the government must establish. *See id.* at 1367 ("the Government would have to demonstrate that the agencies' actions made it impossible for [the Bureau] to deliver to the Districts the full amount of water provided for in the contracts . . ."); *Seaboard Lumber*, 308 F.3d at 1294 ("[T]he doctrine of impossibility does not require a show-

ing of actual or literal impossibility of performance but only a showing of commercial impracticability.").

In sum, the Court of Federal Claims erred in holding that impossibility of performance is not a factor to be taken into account in considering the sovereign acts doctrine. The Bureau's reduction of water deliveries in order to comply with the requirements of the ESA was a public and general act. However, in order to escape liability from breach of contract in this case based on the sovereign acts doctrine, the government has the burden of establishing that performance of the various contracts at issue was impossible. The case is remanded to the Court of Federal Claims so that the government may have the opportunity to carry that burden.[14] Once the court determines whether the government is entitled to assert the sovereign acts doctrine in this case, it should proceed to resolve, in the appropriate manner, plaintiffs' breach of contract claims.

CONCLUSION

For the foregoing reasons, we vacate the judgment of the Court of Federal Claims which dismissed plaintiffs' takings and Compact claims based upon the *Takings*

---

[14] After receiving the views of the parties, the court should determine whether the impossibility of performance question can be decided based upon the existing record or whether additional evidence should be received. Specifically, the court should determine whether additional evidence should be received in order to give the government the opportunity to show that the Bureau lacked alternatives to halting water deliveries in 2001. The court also should determine whether additional evidence should be received in order to give plaintiffs the opportunity to respond to any such showing by the government. Finally, we do not view any party as having waived any arguments it may wish to make on the question of impossibility of performance.

*Decision* and which dismissed plaintiffs' breach of contract claims based upon the *Contract Decision*. The case is remanded to the Court of Federal Claims for further proceedings consistent with this opinion. If the court determines that the government is liable for takings or for breach of contract, or both, it will be necessary for it to address the question of damages. Needless to say, we express no views on whatever issues may arise in the setting of a damages determination.

COSTS

No costs.

*VACATED* and *REMANDED.*

# United States Court of Appeals
# for the Federal Circuit

---

**KLAMATH IRRIGATION DISTRICT, TULELAKE IRRIGATION DISTRICT, KLAMATH DRAINAGE DISTRICT, POE VALLEY IMPROVEMENT DISTRICT, SUNNYSIDE IRRIGATION DISTRICT, KLAMATH BASIN IMPROVEMENT DISTRICT, KLAMATH HILLS DISTRICT IMPROVEMENT CO., MIDLAND DISTRICT IMPROVEMENT CO., MALIN IRRIGATION DISTRICT, ENTERPRISE IRRIGATION DISTRICT, PINE GROVE IRRIGATION DISTRICT, WESTSIDE IMPROVEMENT DISTRICT NO. 4, SHASTA VIEW IRRIGATION DISTRICT, VAN BRIMMER DITCH CO., FRED A. ROBISON, ALBERT J. ROBISON, LONNY E. BALEY, MARK R. TROTMAN, BALEY TROTMAN FARMS, JAMES L. MOORE, CHERYL L. MOORE, DANIEL G. CHIN, DELORIS D. CHIN, WONG POTATOES, INC., MICHAEL J. BYRNE, DANIEL W. BYRNE, AND BYRNE BROTHERS,**
*Plaintiffs-Appellants,*

v.

**UNITED STATES,**
*Defendant-Appellee,*

**and**

**PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,**
*Defendant-Appellee.*

---

2007-5115

---

Appeal from the United States Court of Federal Claims in 01-CV-591, 01-CV-5910 through 01-CV-59125, Judge Francis M. Allegra.

---

GAJARSA, *Circuit Judge*, concurring-in-part and concurring-in-judgment.

In my judgment, the majority opinion is incomplete in some respects. Thus, although I generally agree with the opinion of the court, I write separately to clarify my reasoning on certain issues before us.

I.

When this matter was last before this court, I dissented from the panel's decision to certify certain questions to the Oregon Supreme Court. *Klamath Irr. Dist. v. United States*, 532 F.3d 1376, 1378-81 (Fed. Cir. 2008) (Gajarsa, J., dissenting). Nevertheless, we now have the guidance of the Oregon Supreme Court, and it is binding upon us. *See Engel v. CBS, Inc.*, 182 F.3d 124, 125-26 (2d Cir. 1999); *Grover v. Eli Lilly & Co.*, 33 F.3d 716, 719 (6th Cir. 1994).

In its certification order, the panel identified three questions for certification to the Oregon Supreme Court:

1. Assuming that Klamath Basin water for the Klamath Reclamation Project "may be deemed to have been appropriated by the United States" pursuant to Oregon General Laws, Chapter 228, § 2 (1905), does that statute preclude irrigation districts and landowners from acquiring a beneficial or equitable property interest in the water right acquired by the United States?

2. In light of the statute, do the landowners who receive water from the Klamath Basin Reclamation Project and put the water to beneficial use have a beneficial or equitable property interest appurtenant to their land in the water right acquired by the United States, and do the irrigation districts that receive water from the Klamath Basin Reclamation Project have a beneficial or equitable property interest in the water right acquired by the United States?

3. With respect to surface water rights where appropriation was initiated under Oregon law prior to February 24, 1909, and where such rights are not within any previously adjudicated area of the Klamath Basin, does Oregon State law recognize any property interest, whether legal or equitable, in the use of Klamath Basin water that is not subject to adjudication in the Klamath Basin Adjudication?

*Klamath Irr. Dist. v. United States*, 532 F.3d 1376, 1377-78 (Fed. Cir. 2008). The Oregon Supreme Court unequivocally answered "no" to the first certified question, and "yes" to the third. *Klamath Irr. Dist. v. United States*, 227 P.3d 1145, 1157, 1166 (Or. 2010) ("*Certification Decision*").

The Oregon court's answer to the second question, however, was not definitive. It began by making clear that "[b]enefical use is a necessary but not sufficient condition to acquire a beneficial or equitable property interest in a water right." *Certification Decision*, 227 P.3d at 1160. The

Oregon court then adopted the three factors considered in *Nevada v. United States*, 463 U.S. 110 (1983), as probative, as a matter of state law, of whether landowners have an equitable or beneficial property interest in a water right to which the United States holds legal title. *Certification Decision*, 227 P.3d at 1163. Discussing the first factor—whether the water right was appurtenant to the land—the Oregon court found that it was. *Id.* And discussing the second factor—the relationship that exists between the federal government and plaintiffs—the Oregon court found that "the United States holds the water right that it appropriated . . . for the use and benefit of the landowners." *Id.* at 1163-64. I have no objection to the majority's decision on these two factors, and I join it.

The third factor adopted by the Oregon Supreme Court is "the contractual agreements between the United States and plaintiffs." *Id.* at 1165. I agree with the majority that, on remand, the trial court should direct its attention to the third factor set forth by the Oregon court. *Majority Op.* at 27. But I disagree with the majority's assumption that an equitable water right has been created by the first two factors, and that the contractual agreements between plaintiffs and the government can only "have clarified, redefined, or altered" that preexisting property interest. *Id.* at 28; *see also Certification Decision*, 227 P.3d at 1165. Instead, I read the *Certification Decision* as making the creation of such an interest dependent upon the content of the agreements between the various plaintiffs and the government. *See Certification Decision*, 227 P.3d at 1165 ("[W]e are in no position to provide a definitive answer whether . . . the various contractual agreements between the United States and plaintiffs *support* or *defeat* plaintiffs' claim that they have an equitable or beneficial property interest . . . ." (empha-

sis added)). I therefore believe that the Oregon court was neutral on this factor, but noted its dependency on the terms and conditions of the relevant agreements.

Regardless of how the third factor is analyzed, I agree fully with—and want to emphasize—the majority's statement that the existence of any right must be determined on a case-by-case basis. *Majority Op.* at 27; *see also Certification Decision*, 227 P.3d at 1165-66. The effect of each contract, patent, or other document serving as the basis for plaintiffs' claims must be analyzed in light of its internal content, as well as the law and regulations in effect at the time. *See Hash v. United States*, 403 F.3d 1308, 1315 (Fed. Cir. 2005).

## II.

In addition to the over-arching issue of equitable or beneficial water rights, plaintiffs Van Brimmer Ditch Company ("Van Brimmer"), Klamath Drainage District, and Klamath Hills District Improvement Company assert specific alternative sources of water rights. Appellants 2007 Br. at 45; *see also* Appellants 2007 Reply Br. at 22-23. Because these claims are squarely before us and their disposition depends only upon conclusions of law, I would reach the claims of these three plaintiffs.

## A.

Resolution of the claims asserted by plaintiffs Klamath Drainage District and Klamath Hills District Improvement Company is straight-forward. These plaintiffs assert claims based on water right *permits* with priority dates of 1977 and 1983, respectively. J.A. 43414-17. In their briefing, plaintiffs repeatedly characterize the referenced documents as "water rights *certificates*" granting them vested rights. 2007 Reply Br. at 23 (emphasis added). But these documents are identified as "permits"

on their face. And the trial court, in addition to noting other defects associated with these claims[1], explicitly found that the record contains "no evidence that Oregon has issued a [subsequent] water rights *certificate.*" *Klamath Irr. Dist. v. United States*, 67 Fed. Cl. 504, 539 n.62 (2005) (emphasis added). Absent evidence of subsequent water right *certificates*, the permits provide "only an inchoate right that . . . does not constitute a vested water right." *Fort Vannoy Irr. Dist v. Water Res. Comm'n*, 188 P.3d 277, 290 (Or. 2008) (en banc). I would therefore hold that plaintiffs Klamath Drainage District and Klamath Hills Improvement Company lack any protected property interest based upon the documents in the record.

## B.

Turning to the rights of Van Brimmer, plaintiffs argue that Van Brimmer "does possess a pre-1905 water right" and that a 1909 contract between Van Brimmer

---

[1]    For example, the trial court noted that the Klamath Drainage District permit is for use during a period of time that appears to be outside the period when delivery was suspended in 2001. *Klamath Irr. Dist. v. United States*, 67 Fed. Cl. 504, 539 n.62 (2005). The trial court also included the Klamath Drainage District and Klamath Hills District Improvement Company permits in a discussion of the availability of damages, *id.* at 539, an issue which I do not believe the parties have adequately considered. Assuming that plaintiffs do have an equitable or beneficial property interest in the waters to which the United States took title in 1905, plaintiffs' interests are likely junior to the aboriginal fishing rights of *amici* Indian tribes. I also think it very likely that the water flow allocations associated with Indian fishing rights may be largely co-extensive with the flow allocations made by the United States in 2001. In any event, plaintiffs' damages, if such damages exist, may not be calculable—or even ascertainable—prior to resolution of the state-level adjudication of Klamath Basin water rights.

and the United States "relinquishes only Van Brimmer's riparian rights in lower Klamath Lake, not its appropriative rights." 2007 Reply Br. at 22-23. Assuming, arguendo, that Van Brimmer did obtain a water right with a priority date earlier than that of the United States, I disagree with plaintiffs' interpretation of the 1909 agreement.

We have the ability to interpret the language of the agreement, *San Carlos Irrigation and Drainage District v. United States*, 111 F.3d 1557, 1564 (Fed. Cir. 1997), and we should do so. The 1909 agreement includes a contractual promise by the United States to deliver water, in consideration for which Van Brimmer

> hereby waives and renounces to the use and benefit of the United States any and all of its riparian rights, in relation to the waters and shores of Lower Klamath Lake appurtenant or incident to the lands now being irrigated by [Van Brimmer] . . . and also waives and renounces any and all claims for damages consequent upon or arising from any change of the course or water level of the said Lower Klamath Lake . . . .

J.A. 4270. I interpret this portion of the contract to constitute a quit-claim of Van Brimmer's "riparian rights," a position with which plaintiffs apparently agree. 2007 Reply Br. at 23. The question is what does the contract mean by "riparian rights"?

Prior to February 24, 1909, the State of Oregon applied both the riparian doctrine and the prior appropriation doctrine to the use of surface waters. *Fort Vannoy Irr. Dist.*, 188 P.3d at 283-84 (citing Wells A. Hutchins, The Common-Law Riparian Doctrine in Oregon: Legislative and Judicial Modification, 36 Or. L. Rev. 193 (1957)); *cf.* Oregon General Laws, Chapter 216 (1909) (adopting prior appropriation doctrine). Given this historical context, I

believe that the 1909 contract's quit-claim of "riparian rights" is ambiguous, and I would remand for additional briefing of this specific issue.

### III.

In conclusion, my view differs only by a limited degree with that of the majority. I agree that remand is appropriate, but my guidance would differ on certain aspects of the *Certification Decision*. I therefore concur with the majority in part, and I concur in the judgment.